UNITED STATES DISTRICT COURT
EASTERN DISRICT OF NEW YORK
-------------------------------------------------------------------x
JACQUELINE GAYED, individually and on behalf of   Case No.:  17-Civ- _____
all others similarly situated,

                                         **CLASS ACTION COMPLAINT**

      **Plaintiff,**                        **JURY TRIAL DEMANDED**

**v.**

**UBER TECHNOLOGIES, INC., UBER USA LLC,**
**RAISER, LLC and TRAVIS KALANICK,**

      **Defendants.**
-------------------------------------------------------------------x

## Introduction

1.     Plaintiff Jacqueline Gayed brings this action individually and as a class action

pursuant to the Class Action Fairness Act ("CAFA") on behalf of all Uber X riders in New York

against Defendants Uber Technologies, Inc., Uber USA LLC, Raiser, LLC, and Travis Kalanick

(collectively, "Uber") for violation of New York General Business Law § 349 and unjust

enrichment.

2.     At all relevant times, Uber has made materially misleading and deceptive

representations to Uber X riders concerning the "actual fare" charged by Uber's Upfront Pricing

model.  On the Uber Newsroom post dated June 23, 2016, entitled "Upfront fares:  no math and

no surprises," Uber represented:

> We moved to upfront, per trip fares . . . This allowed us to calculate the actual
>
> fare in advance and show it to riders before they booked their ride.   Knowing
>
> how much a ride will cost in advance is clearly something riders appreciate. . . .
>
> So in April we began slowing introducing upfront fares for regular uberX trips in
>
> cities across the US . . . with more to follow.  To date, hundreds of thousands of

1

riders have experienced upfront fares as part of this rollout.  Upfront fares are calculated using the expected time and distance of the trip and local traffic, as well as how many riders and nearby drivers are using Uber at that moment.  And when fares go up due to increased demand, instead of surge lightning bolts and pop-up screens, riders are given the actual fare before they request their ride. There's no complicated math and no surprises:  riders can just sit back and enjoy the ride.

3.      Contrary to Uber's representations concerning the "cost of the ride" and the "actual fare" charged to Uber X riders via the Upfront Pricing model, Uber has charged Uber X riders a fare that is $1.98 higher on average than the "actual fare", *i.e.*, the fare incurred by the Uber X drivers for the ride.  With 250,000 Uber trips made per day in New York City, and with Uber X rides constituting the majority of rides, Uber is taking an additional $247,500 per day ($1.98 times 125,000, or half the daily trips) or $7.43 million per month ($1.98 times 125,000 trips times 30 days) from the Uber X riders in New York City alone.  Uber, moreover, does not permit riders to opt-out of the Upfront Pricing model.

## The Parties

4.      Plaintiff Jacqueline Gayed is a resident of Brooklyn, New York, and an Uber X rider.

5.      Defendant Uber Technologies, Inc. ("Uber") is a technology company based in San Francisco, California, that offers a smartphone application, the Uber App, to connect riders looking for transportation to independent transportation providers, or drivers, looking for riders.

6.      Defendant Uber USA, LLC ("Uber USA") is a Delaware limited liability company and wholly owned subsidiary of Uber that is engaged in the business of providing lead

generation services to independent transportation providers in New York City who use the Uber X software product.

7.     Defendant Rasier, LLC ("Raiser") is a subsidiary of Uber Technologies, Inc., headquartered in San Francisco, California.  According to the Technology Services Agreement updated as of December 11, 2015, Raiser "provides lead generation to independent providers of rideshare or peer-to-peer rider transportation services using the Uber Services."  Raiser is the Uber subsidiary that entered into the Technology Services Agreement to remit payment to Uber drivers in New York City and other territories in the United States, except for those drivers within the States of California, Pennsylvania, Florida, Montana and New Mexico

8.     Defendant Travis Kalanick is a resident of the state of California and is the cofounder and Chief Executive Officer of Uber.   Upon information and belief, Kalanick is a chief architect of the New York Uber operations and strategy.  Upon information and belief, Kalanick substantially controls Uber's operations and business in New York, personally oversees the hiring or appointment of key personnel for Uber's operations and business in New York, was or is personally involved in the day-to-day operation, management and business strategy of Uber's operations in New York and has the power to set Uber fares and fees.

### Jurisdiction and Venue

9.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.)

10.     Plaintiff Gayed is a citizen of New York.  Defendants are citizens of California and Delaware who do business in New York.  The amount in controversy exceeds $5,000,000, and there are at least one hundred members of the putative class.

11.     This Court has jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in New York, are doing business in New York and have registered with the New York Secretary of State, or do sufficient business in New York, have sufficient minimum contacts with New York, or otherwise intentionally avail themselves of the New York market through the promotion, marketing, sale, and service of the Uber technology platform and Uber App.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

12.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d) (2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).  As of January 2016, there were more than 25,000 Uber drivers dispatched per week in New York City alone, with approximately 250,000 Uber trips per day.  A recent investigation by therideshareguy.com, which reviewed 82 Uber X trips in New York City over a five week period in February and March 2017, found that Uber charged the Uber X rider on average an extra $1.98 per trip for the fare than the fare paid to the Uber X driver for the same ride (excluding taxes and Uber fees).  The investigation conservatively estimated that half of the 250,000 Uber trips per day in New York City are on Uber X, and that Uber is thus charging the Uber X rider an additional $247,500 per day ($1.98 times 125,000 trips) or $7.43 million per month ($1.98 times 125,000 trips times 30 days) in New York City alone.

13.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in this District.

### The Uber Technology Platform

14.     Uber provides technology through its smartphone application (the "Uber App") which allows riders and transportation providers to connect based on their location.  Uber offers the Uber App to both riders and transportation providers (the "Uber drivers") to facilitate transportation services, and it charges a service fee (the "Uber Fee") to Uber drivers for their use of the Uber App.  Uber represents to consumers that it a "technology platform that connects drivers and riders."

15.     Using the Uber App, riders can connect with available Uber drivers offering a variety of transportation options through different software products, including the Uber X product.  The Uber X product connects riders to vehicles operated by livery-licensed individuals and transportation companies offering low cost rides.

16.     All transportation providers who sign up to use the Uber App are given access to an online "Driver Portal."  The Driver Portal stores information particular to each Uber driver regarding the services provided to riders by that driver while using the Uber App.

17.     Uber operates in New York City as a group of Black Car bases and one luxury limousine base, each of which is licensed by the New York City Taxi and Limousine Commission.   Uber effectively operates each of its 28 bases in New York City as a unified company known as "Uber."

18.     All requests for Uber services are made through the Uber App and dispatched to Uber drivers through Uber's centralized dispatch network which also operates via the Uber App.

19.     Uber informs its drivers that they are entitled to charge riders a Fare based on Uber's computer algorithm for pricing based on miles, minutes and wait time, and that Uber takes a percentage of the Fare as a commission, plus deducts from the Fare taxes and certain fees.  The remainder of the Fare is the Uber driver's payment for providing driver services.  Uber makes these representations in the Technology Services Agreement, which is the legal agreement between Uber drivers and Raiser LLC, the Uber subsidiary which provides lead generation through the Uber technology platform to enable authorized drivers to "seek, receive and fulfill requests for transportation services from an authorized user [*i.e.*, the potential rider] of Uber's mobile applications."  The Technology Services Agreement is available online at:

https://s3.amazonaws.com/uber-regulatory-documents/country/united_states/RASIER%20Technology%20Services%20Agreement%20December%2010%202015.pdf.

### Uber Represents A Different Fare to the Rider and the Driver for the Same Trip And Collects The Difference

20.     Uber is a transportation facilitator that connects available Uber drivers with riders needing a ride through the Uber platform via the Uber App.   Uber collects the Fare from the rider via the Uber App and keeps a portion of the Fare (*i.e.*, the "Uber Fee") for its services.  The remainder of the Fare, less additional standard and itemized deductions, is credited to the Uber X driver's account via the Uber App.

21.     The Technology Services Agreement provides that the Fare charged to the rider is the same as the Fare received by the driver, less the Uber fees and taxes, and that payment made by the rider to Uber via the Uber App shall be considered the same as payment made directly by the rider to the driver:

4.1  Fare Calculation and Your Payment.  You [the Uber driver] are entitled to charge a fare for each instance of completed Transportation Services provided to a User [*i.e.*, the rider or "end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services"] that are obtained via the Uber Services ("Fare"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("Fare Calculation").  You acknowledge and agree that the Fare provided under the Fare Calculation is the only payment you will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of transportation Services, if applicable.  You:  (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, the applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the same as payment made directly by User to you.  In addition, the parties acknowledge and agree that as between you and the Company, the Fare is the recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount.

22.      In addition to representing that the Fare charged to the rider is the same as the

Fare collected by the driver, less the applicable Uber fees and taxes, the Technology Services

Agreement states:

You [the driver] shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare. . . Company shall consider all such requests from you in good faith.  Company agrees to remit, or cause to be remitted, to you on at least a weekly basis:  (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees.

23.      The Technology Services Agreement also states that Uber may change the Fare

calculations upon providing notice to the drivers:

4.2  Changes to Fare Calculations.  Company reserves the right to change the Fare Calculation at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare.

7

24.     The Technology Services Agreement acknowledges that "the Company [is] acting as the limited payment collection agent solely for the purpose of collecting payment from Users [riders] on your behalf."

25.     At no time did Uber represent that the Fare it charged to the Uber X rider via the Upfront Pricing model was different and higher on average than the Fare it represented to Uber X driver as having been incurred for the same ride.  To the contrary, Uber actively represented to Uber X riders and Uber X drivers that the Fare charged to the rider for the ride was the same Fare remitted to the driver for that ride, less Uber's fees and taxes.

26.     Prior to the implementation of the Upfront Pricing model, the Uber X driver and Uber X rider were able to compare the fare at the end of the ride in real time.

27.     Sometime in or around early 2016, however, with the implementation of the Upfront Pricing model for Uber X, the Uber X driver would experience a delay in seeing the Fare credited to his or her account on the Uber App.  Sometimes the delay would be half an hour, and other times the delay would be several hours.

28.     In addition, at or around this same time, Uber X drivers lost the ability to contact Uber X riders directly.  Prior to this time, Uber X drivers could contact Uber X riders directly following the ride, if, for instance, the rider left an item in the Uber X vehicle.  But changes in the Uber platform prevented Uber X drivers from directly contacting riders.  Instead, if a rider left an item in the Uber vehicle, he or she would have to contact Uber, and Uber would contact the driver.

29.     Unbeknownst to Uber X riders, changes were made in the Uber platform which resulted in a different, and on average, higher fare being charged to the rider than the actual fare incurred by the Uber X driver for the same ride.

8

30.     On the Uber Newsroom post dated June 23, 2016, entitled "Upfront fares:  no math and no surprises," Uber represented:

> We moved to upfront, per trip fares . . . This allowed us to calculate the actual fare in advance and show it to riders before they booked their ride.   Knowing how much a ride will cost in advance is clearly something riders appreciate. . . . So in April we began slowly introducing upfront fares for regular uberX trips in cities across the US . . . with more to follow.  To date, hundreds of thousands of riders have experienced upfront fares as part of this rollout.  Upfront fares are calculated using the expected time and distance of the trip and local traffic, as well as how many riders and nearby drivers are using Uber at that moment.  And when fares go up due to increased demand, instead of surge lightning bolts and pop-up screens, riders are given the actual fare before they request their ride. There's no complicated math and no surprises:  riders can just sit back and enjoy the ride.

31.     Uber's Upfront pricing model calculates the rider's total fare before an Uber driver begins to provide transportation services to the rider.  At all relevant times, Uber represented to both the Uber X rider and the Uber X driver that the amount identified in the upfront pricing was the "actual fare" and that amount was determined based upon Uber's standard algorithm for base fare plus a per mile and per minute charge for the estimated distance and time of travel within the Uber territory. Uber knew, and failed to disclose, that the Upfront Pricing model was causing the Uber X rider to be over charged when compared with the actual fare incurred by the Uber X driver for the same ride.  Upon information and belief, this is because Uber's Upfront Pricing model uses a different, and longer and/or less efficient route, to

calculate the Uber X rider's fare and instruct the Uber X driver to use a more efficient route.  At no time did Uber disclose to the Uber X rider that the represented "actual fare" was not the same as the fare incurred by the Uber X driver for the ride and that the Uber X rider fare was, on average, more than the fare incurred by the driver for the ride.  Nor did Uber disclose that the with Upfront Pricing, the Uber X rider fare was based on a less efficient route than the route which Uber instructed, and in many instances required, the Uber X driver to take.  Uber's representations concerning the "expected trip" were false because Uber knew and failed to disclose to both the Uber X rider and Uber X driver that it calculated the Uber X rider fare based on a route which it did not expect the Uber X driver to use and further instructed the Uber X drivers to use a different, and more efficient, route.  Similarly, Uber's representations about the "actual fare" charged to the Uber X customer by the Upfront Pricing model were materially false and misleading because the "actual fare" incurred by the Uber X driver for the same ride is, on average, $1.98 less than the fare Uber charges the Uber X rider.  Uber represented that "[k]nowing how much a ride will cost in advance is clearly something riders appreciate," but then failed to charge the Uber X rider the "cost" of the ride, and instead, charged the Uber X rider, on average, more than the cost of the ride.

32.     On September 15, 2016, at approximately 9:38 p.m., Uber charged Plaintiff a fare in the amount of $13.02 for an Uber X ride using the Upfront Pricing model. On September 16, 2016, at approximately 3:12 p.m., Uber charged Plaintiff a fare in the amount of $21.87 for an Uber X ride using the Upfront Pricing model.  On September 22, 2106, at approximately 7:34 p.m., Uber charged Plaintiff a fare in the amount of $19.22 for an Uber X ride using the Upfront Pricing model.  Upon information and belief, Plaintiff's fare was higher than the fare incurred by the driver for the same ride.

33.     Plaintiff's husband, Mohammed Gayed, is an Uber X driver. In or around 2017, he began to compare the fare that Uber collected from the UberX rider with the Fare that Uber eventually reflected in his Uber driver's account for the same trip.

34.     Mr. Gayed discovered that the Uber App was charging the Uber X rider a higher fare and then representing to the Uber X driver that a lower Fare had been charged for the ride. Upon information and belief, Uber pockets the difference between the higher fare it charges the Uber X rider and the lower Fare which it represents to the Uber X driver as having been actually incurred for that ride.

35.     For example, on February 25, 2017, Mr. Gayed completed a trip from 685 18th Street, Brooklyn New York, 11230 to 633 Vanderbilt Avenue, Brooklyn, New York 11238 at or around 11:46 a.m.  The screen shot from the rider's phone reflects that the Uber platform charged the rider a Fare of $16.60 for this trip via the Uber App.  However, the Uber platform via the Uber App represented to Mr. Gayed that the Fare for this same trip was only $12.79, less deductions for the Uber Fee of $2.56, the Black Car Fund of $0.37 and Sales Tax of $1.32, for a total estimated payout to Mr. Gayed of $8.54.

 

36.      In or around this same time in February 2017, Mr. Gayed completed a trip from

247 Clinton Street, Brooklyn, New York 11201 to 190 Green Street, Brooklyn, New York,

11222, at approximately 5:15 p.m.  The screen shot from the rider's phone reflected that the

Uber platform charged the rider a Fare of $25.58 for this trip.  However, later that evening the

Uber platform represented to Mr. Gayed in his Uber driver's account that the Fare for this trip

was only $21.70.  After deductions for the Uber Fee, the Black Car Fund and Sales Tax, Mr.

Gayed's payout was $14.77.





37.     In or around this same time in February 2017, Mr. Gayed completed a trip from

170 Tillary Street, Brooklyn, New York, 11201 to 51-2-21st Street, Long Island City, New York

11101 at approximately 2:30 p.m.  The screen shot from the rider's phone reflects that the Uber

platform charged the rider a Fare of $25.58 for this trip.  However, the Uber platform represented

to Mr. Gayed in his Uber driver's account that the Fare for this trip was only $22.50.  After

deductions for the Uber Fee, the Black Car Fund and Sales Tax, Mr. Gayed's payout was $15.95.




38.      In or around this same time in February 2017, Mr. Gayed commenced a trip at approximately 3:24 p.m. from 120 Wall Street, New York, New York 10025 to 407 Graham Avenue, Brooklyn, New York.  The trip was completed at approximately 3:59 p.m.  The screen shot from the rider's phone reflects that the Uber platform charged the rider a Fare of $23.36 for this trip.  However, the Uber platform represented to Mr. Gayed in his Uber driver's account that the Fare for this trip was only $19.20.  Less deductions for the Uber Fee, the Black Car Fund and the Sales Tax, Mr. Gayed's payout for this trip was $12.98.




39.     In or around this same time in February 2017, Mr. Gayed commenced a trip at approximately 7:17 p.m. from 167 Rivington Street, New York, New York 10002 to JFK International Airport.  The trip was completed at approximately 8:01 p.m. The screen shot from the rider's phone reflects that the Uber platform charged the rider a Fare of $61.30 for this trip. However, the Uber platform represented to Mr. Gayed in his Uber driver's account that the Fare for this trip was only $46.30.  Less deductions for the Uber Fee, the Black Car Fund and the Sales Tax, Mr. Gayed's payout for this trip was $30.78.




40.     In or around this same time in early 2017, another Uber X driver completed a trip from 408 West 130th Street, New York, NY 10027 to the Newark International Airport, Terminal A, in Newark, New Jersey 07114    The Uber X rider was charged by the Uber platform for a Fare of $87.90, which upon information and belief included reimbursement to the driver for the toll of $22.15.   However, the Uber Platform represented to the Uber X driver that the Fare for this trip was only $45.87, plus reimbursement for a toll of $22.15, less the Uber Fee of $9.17 and less the Black Car Fund of $2.14, for a total payout to the Uber X driver of $56.71.

17

41.     Upon information and belief, Uber simply pockets the difference between the higher fare charged to the Uber X rider via the Uber App, and collected via the Uber platform, and the lower Fare it represents to the Uber X driver via the Uber App as having been incurred for the identical ride.

42.     When Mr. Gayed and other Uber X drivers accept a rider request for transportation, the rider's final destination is populated into the driver's Uber App and the Uber X driver is provided with navigation instructions from Uber directing him or her to the best route.

43.     However, the Uber software that calculates the Upfront Pricing that is displayed and charged to the Uber X rider calculates the expected distance and time using a route that is longer in both distance and time and less efficient than the route Uber displays in the driver's Uber App.

44.     Upon information and belief, Uber has intentionally designed the software that calculates the Upfront Price to use a longer, less efficient route than the route which Uber uses to populate the driver's Uber App in order to charge the rider a higher fare and pay the driver a lower fare, when the two should be the same fare as set forth in the Technology Services Agreement. Uber, moreover, represents to Uber X riders that the fare they are charged by Uber is based on the same components as the Fare received by the Uber X driver for the trip:  base fare, distance per mile, and time.  Uber fails to disclose that its Upfront Pricing calculation uses different routes for the Uber X rider and the Uber X driver for the requested trip.

45.     In May 2017, Uber represented by text to Plaintiff that the Fare used in the Upfront Pricing model is based on the following components:  a standard base fare, which currently in 2017 is $2.55, a standard per minute charge, currently $0.35 per minute, a standard

per mile fare, currently $1.75 per mile.   Uber failed to disclose that the route used to calculate the Uber X rider fare using the Upfront Pricing is longer and/or less efficient than the route Uber instructs the Uber X driver to use.  In May 2017, Plaintiff wrote to Uber requesting that she be permitted to opt-out of the Upfront Pricing.  Uber has not permitted Plaintiff to opt-out of the Upfront Pricing model.

46.     The Uber arbitration clause cannot be enforced against Uber riders, see *Meyer v. Kalanick*, 199 F. Supp. 3d 752 (S.D.N.Y. 2016).

## Class Allegations

### A.     Class Definition

47.     Plaintiff Gayed brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other persons similarly situated. Plaintiff seeks to represent the following class:

> All Uber X riders in New York who have been charged for rides based on Uber's Upfront Pricing model for Uber X, which was implemented in or around April 2016.

48.     Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

49.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.     Numerosity

50.     The proposed class is so numerous that joinder of all members would be impracticable.  There are presently approximately 250,000 Uber rides taken daily in New York City alone.  The Uber X rider is the most popular Uber rider, and upon information and belief, conservatively constitutes at least half of the Uber daily riders in New York.  The individual

class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Uber for the Uber App users/riders.   The number of class members is at least in the tens of thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.   Plaintiff does not anticipate any difficulties in the management of the action as a class action.

      **C.**     **<u>Commonality</u>**

51.     There are questions of law and fact that are common to Plaintiff's and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.   Among such common questions of law and fact are the following:

     a.  Whether Uber made materially deceptive, false and misleading statements to Uber X riders concerning Upfront Pricing, including the "expected route" and the "actual fare";

     b.   Whether Uber designed software to calculate a more expensive fare for the Uber X riders than the "actual fare" incurred by the Uber X drivers;

     c.  Whether Uber has profited unfairly at the expense of Plaintiff and the Class as a result of their unlawful actions; and

     d.  Whether Plaintiff and the Class are entitled to damages and/or injunctive relief as a result of Uber's conduct.

      **D.**     **<u>Typicality</u>**

52.     Plaintiff is a member of the Class she seeks to represent.  Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Uber's unlawful conduct.   Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Uber's wrongful conduct.

E.     **Adequacy of Representation**

53.     Plaintiff is an adequate representative of the Class she seeks to represent and will fairly and adequately protect the interests of that class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent her.  There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

54.     To prosecute this case, Plaintiff has chosen the undersigned law firm, which is very experienced in class action litigation and have the financial and legal resources necessary to pursue this type of litigation.

F.     **Requirements of Fed. R. Civ. P. 23(b)(3)**

55.     The questions of law or fact common to Plaintiff's and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed Class members are based on the same false representations and deceptive actions by Uber, namely, that (a) the Fare charged to the Uber X rider is the same as the Fare incurred by the Uber X driver for the trip; (b) that Uber acts only as a collection agent and collects the Fare from the rider via the Uber App and remits the same Fare to the Uber X driver, less standard Uber fees and taxes; (c) that the Fare is based on the following components:  a standard base fare, which currently in 2017 is $2.55, a standard per minute charge, currently $0.35 per minute, a standard per mile fare, currently $1.75 per mile, and a minimum fare, currently an $8 minimum, for the distance and time of travel; when at all relevant times, the Uber App represents and charges the Uber X  rider a higher amount for the fare than the actual Fare incurred by the Uber X driver for the same ride; and (d)

Uber software uses a longer, less efficient route to calculate the Upfront Price for the Uber X rider and instructs the Uber X driver to use a shorter, more efficient route.  As a result, Uber fails to act solely as a collection agent on behalf of the Uber X riders and drivers, has failed to collect the Fare from the rider and remit the same Fare, less standardized Uber fees and taxes, to the Uber X drivers, and has knowingly omitted material information from the Uber X rider that the Upfront Pricing fare is based on a different, longer and less efficient route than the actual fare incurred by the Uber X driver who is directed by Uber to use a short and more efficient route, that the "estimated route" used to calculate the Upfront Pricing fare for the Uber X rider is not the route Uber instructs the Uber X driver to use; and that the "actual fare" which is incurred by the Uber X driver is not the same as the fare charged to the Uber X rider.

56.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.  As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.     <u>Superiority</u>**

57.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside throughout New York;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

58.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

59.    Uber has acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

60.    Plaintiff realleges and incorporate paragraphs 1-59, above as if fully set forth herein and further alleges as follows.

61.    Uber's acts and practices alleged herein constitute acts, uses, or employment by Uber and its agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Uber in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

23

62.     Uber's conduct is deceptive because it is likely to mislead consumers.  Indeed, Uber represented to Plaintiff and other Uber X riders on June 23, 2016 the following:

> We moved to upfront, per trip fares . . . This allowed us to calculate the actual fare in advance and show it to riders before they booked their ride.  Knowing how much a ride will cost in advance is clearly something riders appreciate. . . . So in April we began slowing introducing upfront fares for regular uberX trips in cities across the US . . . with more to follow.  To date, hundreds of thousands of riders have experienced upfront fares as part of this rollout.  Upfront fares are calculated using the expected time and distance of the trip and local traffic, as well as how many riders and nearby drivers are using Uber at that moment.  And when fares go up due to increased demand, instead of surge lightning bolts and pop-up screens, riders are given the actual fare before they request their ride.  There's no complicated math and no surprises:  riders can just sit back and enjoy the ride.

63.     Uber also represented that the Uber App connected riders with drivers and served as a collection portal by charging the rider for the Fare based on the time and distance of the trip and local traffic, as well as the number of drivers and riders using the Uber App at that moment, and remitting the Fare to the driver, less applicable deductions for taxes and fees.  These representations were made by Uber, *inter alia*, in the Uber newsroom post and the Technology Services Agreement.

64.     Uber's representations to Plaintiff and other Uber X riders, who are members of the consuming public, were materially misleading because they lead them to believe that they were being charged the same Fare based on the time and distance of the trip and local traffic, as well as the number of drivers and riders using the Uber App at that moment as the Uber X driver was incurring based on these same factors, and that Uber was merely acting as a collections agent to remit the Fare collected from the rider to the driver, less applicable Uber fees and taxes.

65.     Uber reasonably knew and failed to disclose that the fare it charged the Uber X rider using the Upfront Pricing model was not the "actual fare" incurred by the Uber X driver, that the fare charged to the Uber X rider was not based on the "expected route" to be used by the driver,

but on a route intentionally different and on average, longer and less efficient, than the route which Uber instructed the Uber X driver to take.  Contrary to its representations, Uber is not acting merely as a collections agent between rider and driver, but is profiting at the expense of the unknowing rider by charging a fare higher than the actual fare incurred for the ride and on which the driver's pay is based.  Moreover, although Uber represented that "[k]nowing how much a ride will cost in advance is clearly something riders appreciate," Uber intentionally charged Uber X riders more than the cost of the ride.

66.     Uber's acts and misrepresentations constitute acts, uses, or employment by Uber and its agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of defendant in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

67.     The unfair and deceptive trade acts and practices of Uber have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the Class. Indeed, an investigative report found that Uber charged the Uber X rider in New York a fare that on average was $1.98 more per ride than the actual fare incurred by the driver for that same ride.

68.     Plaintiff and the other members of the Class have no adequate remedy of law.

## COUNT II

## UNJUST ENRICHMENT

69.     Plaintiff realleges and incorporates paragraphs 1-59, above as if fully set forth herein and further alleges as follows.

25

70.     Uber has over-charged and collected a fare from the Uber X rider which is, on average, more than the actual fare incurred for that ride.

71.      Uber has pocketed the difference between the fare it charges the Uber X rider and the fare it remits to the Uber X driver, excluding the Uber fees and taxes.

72.     As a result, Plaintiff and the Class have conferred a benefit on Uber.

73.      Uber had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on Uber.

74.     Uber will be unjustly enriched if Uber is allowed to retain the aforementioned benefits, and Plaintiff and each class member is entitled to recover the amount by which the Uber was unjustly enriched at his or her expense.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and all similarly situated individuals demand judgment against Uber as follows:

a.  Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and her counsel to be representatives of the Class;

b.  Awarding damages sustained by Plaintiff and the Class as a result of Defendants' actions, together with pre-judgment interest;

c.  Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

d.  Awarding statutory damages under GBL § 349;

e.  Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of

expenses;

Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

May 24, 2017                     **GISKAN SOLOTAROFF & ANDERSON LLP**

/s/ Catherine E. Anderson
Catherine E. Anderson, Esq.
canderson@gslawny.com
217 Centre Street, 6th Floor
New York, New York 10013
Telephone: 212-847-8315

*Counsel for Plaintiff and the Class*